UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/27/18

MANUEL FANA,

                Plaintiff,

      - against -

THE CITY OF NEW YORK, DET. DUSTIN
GENCO, Shield No. 6504, Individually and in
his Official Capacity, P.O. THOMAS
DEMKIW, Shield No. 4600, Individually and
in his Official Capacity, SGT. SEAN
LYNCH, Shield No. 4339, Individually and in
his Official Capacity, DET. ALEJANDRO
OLAN, Shield No. 430, Individually and in
his Official Capacity, and POLICE
OFFICERS "JOHN DOE" 1-3, Individually
and in their Official Capacities, the names
"JOHN DOE" being fictitious as the true
names are not presently known,

                Defendants.

**MEMORANDUM
OPINION & ORDER**

15 Civ. 8114 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        Plaintiff Manuel Fana brings this action against the City of New York (the

"City"), Detective Dustin Genco, Police Officer Thomas Demkiw, Sergeant Sean Lynch, and

Detective Alejandro Olan alleging claims under Section 1983 and New York state law. (Am.

Cmplt. (Dkt. No. 48)) Plaintiff's claims stem from his arrest on March 6, 2014 – when he was

allegedly beaten by Detective Genco (id. ¶¶ 14-27) – and his arrest by Officer Demkiw, Sergeant

Lynch, and Detective Olan on July 18, 2014. (Id. ¶¶ 28-46)

        As to the July 18, 2014 arrest, the Amended Complaint pleads claims under (1)

Section 1983 and state law for false arrest and malicious prosecution; (2) Section 1983 for failure

to intercede; and (3) Section 1983 for First Amendment retaliation. (Id. ¶¶ 47-65, 69-72, 101-116)

The City, Officer Demkiw, Sergeant Lynch, and Detective Olan (collectively, "Defendants") have moved for summary judgment on Plaintiff's claims arising out of the July 18, 2014 arrest. (Def. Mot. (Dkt. No. 77)) Defendants argue that "there was indisputably probable cause for [P]laintiff's arrest o[n] July 18, 2014 and prosecution related thereto." (Def. Br. (Dkt. No. 79) at 7)[1] Defendants also argue, in the alternative, that "the defendant officers should be afforded qualified immunity arising from the July 18, 2014 incident." (Id.) As to Plaintiff's First Amendment retaliation claim, Defendants contend that Plaintiff "can offer no specific proof of an improper motive on the part of any of the defendant officers." (Id. at 16)

Plaintiff has cross-moved for summary judgment on his false arrest claims stemming from the July 18, 2014 incident. (Pltf. Mot. (Dkt. No. 84)) Plaintiff contends that he is entitled to summary judgment on his (1) Section 1983 claim against Officer Demkiw, Sergeant Lynch, and Detective Olan; and (2) state law claim against the City. (Pltf. Br. (Dkt. No. 86) at 7)

For the reasons stated below, the parties' cross-motions for summary judgment will be denied.

---

[1] Except as to deposition transcripts, all citations in this Order reflect page numbers assigned by this District's Electronic Case Filing system. Citations to deposition transcripts reflect the page numbers assigned by the court reporter.

## BACKGROUND[2]

In the late afternoon of July 18, 2014, four members of the New York City Police Department ("NYPD") – Officer Demkiw, Sergeant Lynch, Detective Olan, and non-party Detective Porter – arrested three men on Aqueduct Avenue in the Bronx on narcotics charges. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 81) ¶ 1; Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 88) ¶¶ 8-10)

Plaintiff had no involvement in the events that led to these arrests. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 81) ¶ 1) An NYPD detective observed narcotics being passed by one man to another in a car. (Id. ¶ 2) Officers removed three men from the car (id. ¶ 3), observed narcotics in plain view (id. ¶ 4), and then detained the three men behind the car as they continued their investigation. (Id. ¶ 6; see also M. Fana Video (Dkt. No. 83-1) at 0:00 to 2:00)

While the officers were conducting their investigation, Plaintiff, Plaintiff's brother, and two associates pulled up in another car on Aqueduct Avenue. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 81) ¶ 5) The road was blocked because of the police investigation. (Id.) Plaintiff got out of the car and approached the area of the investigation. (Id. ¶¶ 5-6) From a position behind the suspects' car, Plaintiff began to videotape the scene, using his cell phone. (Id. ¶ 7) Plaintiff stood a few feet from the curb on the left side of Aqueduct Avenue in an

---

[2] To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence. See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted). Where the non-moving party disputes the moving party's characterization of cited evidence, and has presented an evidentiary basis for doing so, the Court relies on the non-moving party's characterization of the evidence. See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion). Unless otherwise indicated, the facts cited by the Court are undisputed.

3

adjacent field. (Id. ¶ 7; see also M. Fana Video (Dkt. No. 83-1) at 0:00 to 2:00) The video footage recorded by Plaintiff has been submitted to the Court, and the parties consent to its admission for purposes of their cross-motions for summary judgment. (M. Fana Video (Dkt. No. 83-1); Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 88) ¶ 1)

At the beginning of Plaintiff's video, the three suspects are lined up against the trunk of their car facing the camera, while the four officers are standing in the suspects' general vicinity. The scene is calm, and both the suspects and the officers appear at ease, chatting about basketball.[3] (M. Fana Video (Dkt. 83-1) at 0:53 to 2:00) It is difficult to determine the precise distance between Plaintiff and the arrest scene – in part because Plaintiff uses the zoom function on his cell phone to zoom in and out frequently throughout the video – but Plaintiff is clearly some distance away. (See, e.g., M. Fana Video (Dkt. No. 83-1) at 1:00 to 1:18; Olan Dep. (Dkt. No. 81-3) at 59-60) Sergeant Lynch testified that Plaintiff was between eight and ten feet away (Lynch Dep. (Dkt. No. 81-6) at 11-12); Detective Olan testified that Plaintiff was "approximately 20 to 25 feet" away (Olan Dep. (Dkt. No. 81-3) at 24-25); and Plaintiff's brother estimates that Plaintiff was approximately "20 [or] 30 feet" from the arrest scene. (K. Fana Dep. (Dkt. No. 81-11) at 70)

Approximately two minutes after Plaintiff began videotaping, Detective Olan – who was standing close to the suspects – turned to Plaintiff and asked, "can I help you?" (M. Fana Video (Dkt. No. 83-1) at 2:07) Plaintiff responded, "the thing is that you guys always violate our rights, you understand." (Id. at 2:06 to 2:13) Detective Olan replied, "no problem,

---

[3] This Court recognizes that, although the officers' interaction with the suspects was peaceful and calm throughout, the encounter described herein is inherently risky for officers performing their duties,

4

no problem" and turned away from Plaintiff. (Id. at 2:14) Plaintiff said, "That's it. I'm just recording. No problem with that." (Id. at 2:15 to 2:20)

Over the next twenty seconds, Detective Olan remained standing near the three suspects. (Id. at 2:21 to 2:39) Plaintiff continued to videotape from his same position in back of the curb on the left side of Aqueduct Avenue. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 81) ¶ 10; see also M. Fana Video (Dkt. No. 83-1) at 2:21 to 2:39) During that time, Detective Olan's attention appears focused on the suspects (Olan Dep. (Dkt. No. 81-3) at 24), who were eventually handcuffed. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 81) ¶ 11) Plaintiff filmed the handcuffing, which proceeded without incident. (M. Fana Video (Dkt. No. 83-1) at 2:40 to 2:53)

About fifteen seconds later, Plaintiff – still in the area behind the curb on the left side of Aqueduct Avenue – begins walking parallel to the suspects' car, to an area opposite the driver's side door. (Id. at 3:10 to 3:20) Plaintiff then filmed Officer Demkiw, who had opened the driver's side door and had begun searching the area around the driver's seat. (See id.; Demkiw Dep. (Dkt. No. 81-8) at 11-12) As Plaintiff began walking forward, Detective Olan commented, "My man, really?" (M. Fana Video (Dkt. No. 83-1) at 3:10) When Plaintiff reached the area opposite the driver's seat in the suspect's vehicle, Officer Demkiw was bent over, with his head inside the driver's door and his back to Plaintifff. (Id. at 3:20) Officer Demkiw's weapon was holstered at the right side of his waist. (Id.) Nothing stood between Plaintiff and Officer Demkiw at that time. (See id.)

It is not clear from the video precisely how close Plaintiff was to Officer Demkiw. (See id.) Detective Olan testified that Plaintiff was about ten to fifteen feet away from Officer Demkiw (Olan Dep. (Dkt. No. 81-3) at 59), and that Detective Olan, who was behind the suspects' car, was always closer to Officer Demkiw than Plaintiff was. (Id. at 34-35) Sergeant

5

Lynch testified, however, that he observed Plaintiff get "within five feet" of an officer, although he could not recall which officer Plaintiff was close to. (Lynch Dep. (Dkt. No. 81-6) at 18-19) Based on the officers' locations at the time, the officer to whom Sergeant Lynch referred is likely Officer Demkiw. (See M. Fana Video (Dkt. No. 83-1) at 3:10-3:45) According to Sergeant Lynch, Plaintiff's approach to an area near Officer Demkiw created "a very unsafe situation," because – while Detective Demkiw was searching the car – he was "not really paying attention to what[] [was] going on," and "his gun was right there." (Lynch Dep. (Dkt. No. 81-6) at 18, 26) Detective Olan likewise testified that he believed Plaintiff posed a threat to the officers at this time, because "while [Officer Demkiw] was searching, his firearm was exposed. . . ." (Olan Dep. (Dkt. No. 81-3) at 39)

Plaintiff maintained his position opposite Officer Demkiw and the driver's seat of the car, and filmed Officer Demkiw for about twenty seconds. (M. Fana Video (Dkt. No. 83-1) at 3:10 to 3:29) None of the officers said anything to either Plaintiff or Officer Demkiw during this time. (Id.) According to Detective Olan, Plaintiff did not make any sudden movements toward Officer Demkiw. (Olan Dep. (Dkt. No. 81-3) at 39) Instead, Plaintiff merely stood holding his phone up in front of him, recording the entire time. (Id. at 40) Officer Demkiw did not hear Plaintiff say anything, and did not "take any notice [of] him." (Demkiw Dep. (Dkt. No. 81-8) at 12)

About twenty seconds after Plaintiff had positioned himself opposite Officer Demkiw and the driver's seat of the suspects' car, Detective Olan asked Plaintiff, "[c]an you take that on the other side of the fence, please? I don't want to be looking at you and them while he's searching the vehicle." (M. Fana Video (Dkt. No. 83-1) at 3:29) The fence to which Detective Olan referred appears to be about three feet high and runs parallel to Aqueduct Avenue. (Def.

6

Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 88) ¶ 21; Dwyer Aff. (Dkt. No. 85-10) at 7) The fence is about fifty feet away from the street. (Dwyer Aff. (Dkt. No. 85-10) at 1) As Plaintiff responded, "Oh, no problem officer," Detective Olan interrupted and said, "[o]ther side of the fence, please. Other side of the fence." (M. Fana Video (Dkt. No. 83-1) at 3:30 to 3:33) Plaintiff replied, "[s]ir, I am not threatening anyone." (Id. at 3:34 to 3:37) Plaintiff was speaking at normal volume; he did not raise his voice. (Id.) Plaintiff did not move to the other side of the fence; he may have stepped backward, but the video is inconclusive. (Id. at 3:32 to 3:35)

Detective Olan told Plaintiff, "I am watching him," gesturing toward Officer Demkiw, who was then searching the back seat of the car. (Id. at 3:37) Plaintiff responded – again in a normal tone – "[n]o problem. I'm just here recording." (Id. at 3:38 to 3:39) Detective Olan then stated, "[d]o me a favor, over the fence please. You can do all the videoing you want. Just do it on the other side of the fence." (Id. at 3:40 to 3:47) Plaintiff said, "no problem, no problem." (Id.) Again, Plaintiff did not move to the other side of the fence; he may have stepped back, but the video is inconclusive. (Id. at 3:43 to 3:47)

Detective Olan immediately reiterated, "[i]f you could do it on the other side of the fence please." (Id. at 3:48 to 3:51) Plaintiff did not move to the other side of the fence, and it is not clear from the video whether he retreated further. (Id.) Plaintiff said, in a slightly elevated tone, "[t]his is a free country, sir." (Id. at 3:52 to 3:53) Detective Olan replied, "I understand that." (Id. at 3:54) In a slightly elevated tone, Plaintiff said, "I'm not posing a threat [to] anyone. I'm not posing a threat, sir." (Id. at 3:55 to 3:58) Detective Olan again asked Plaintiff to go to the other side of the fence, but Plaintiff did not move to the other side of the fence, and it is not clear from the video whether he moved farther back. (Id. at 3:59 to 4:02) Plaintiff repeated, in a lower tone of voice, "I'm not posing a threat [to anyone]." (Id.) When

7

Detective Olan responded, "[y]es you are," Plaintiff interjected, in a slightly elevated tone, "[y]ou guys are violating people's rights." (Id. at 4:03 to 4:04)

Detective Olan replied, "I am not violating anybody's rights." (Id. at 4:05) Plaintiff responded, in the same, slightly elevated tone, "[y]ou guys are always violating our rights, and that's not right." (Id. at 4:05 to 4:07) Detective Olan then again twice asked Plaintiff to move to the other side of the fence. (Id. at 4:08 to 4:11) Plaintiff responded, in a lower tone of voice, "[s]ir, I am going to go to the other side of the fence, but I will be recording." (Id. at 4:12 to 4:13) Detective Olan replied, "[t]hank you." (Id.) Plaintiff did not immediately move to the area behind the fence, however, and it is not clear from the video whether he moved farther back. (Id.) Plaintiff said, in a slightly elevated tone, "You guys are always violating our rights for no reason, pulling us over without probable cause." (Id. at 4:14 to 4:20) Detective Olan again asked Plaintiff to move to the other side of the fence. (Id.) Plaintiff then moved to the other side of the fence. (See id. at 4:22 to 4:23; Olan Dep. (Dkt. No. 81-3) at 62-63; M. Fana Dep. (Dkt. No. 81-4) at 49-50; Lynch Dep. (Dkt. No. 81-6) at 20-22, 24)

The parties agree that Detective Olan asked Plaintiff to move behind the fence approximately eight times before Plaintiff moved behind the fence. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 81) ¶¶ 21-22) Detective Olan testified, however, that each time he asked Plaintiff to move behind the fence, Plaintiff stepped backwards. (Olan Dep. (Dkt. No. 81-3) at 32 ("Q. So after you told him to move behind the fence, he turned and walked to the fence? A. Yes, as he was videotaping the same time."); id. at 60 ("When I told him to step back, he was slowly stepping back. . . . He didn't stay still, no.")) Ultimately Plaintiff backed up approximately fifteen to twenty feet. (Id. at 61 ("Q. So based on your earlier testimony, during

8

that interaction, he would have moved back approximately 15 to 20 feet? A. Give or take,

yes."))[4]

[4] Sergeant Lynch testified, however, that Plaintiff moved closer to the suspects' vehicle after Detective Olan told him to go behind the fence. (Lynch Dep. (Dkt. No. 81-6) at 18 ("Q. At some point, did [Plaintiff] back up? A. Eventually, that was after him getting even closer to the vehicle that we were around. Q. Just so I understand, you noticed [Plaintiff], you heard Detective Olan tell him to back up. [Plaintiff] then got closer to the vehicle, is that correct? Yes."); see also id. at 26 ("At one point, after being asked to move six times, he got closer to the vehicle."))

It does not appear from the video that Plaintiff moved towards the suspects' car and Detective Demkiw after Detective Olan asked Plaintiff to move behind the fence. Given Plaintiff's use of the zoom function, however, the video is not dispositive on this issue. (See, e.g., M. Fana Video (Dkt. No. 83-1) at 3:45 to 3:53)

At his deposition, Plaintiff testified as follows concerning his interactions with Detective Olan:

Q. Do you remember ever being told to move back by the officers?

A. Yes, I remember, yes.

Q. When you were told to move back, did you actually move back?

A. I believe the officer told me that if I wanted to record to go behind the [fence,] and I complied. I went behind the [fence.]

Q. Did you comply right away or did you wait a while?

A. I have the right to record and I was reporting. I didn't feel, to be honest, there was a need to go behind [the fence] because I was standing on public grounds and I wasn't being a threat to anyone. I was simply recording.

Q. Did you go behind the fence right away when he told you?

A. I believe I had told him that I have the right to . . . record. . . . I believe I told them I'm not being a threat. I don't have any drugs or weapons on me. I have a right to record and I just kept recording. Then eventually I did go behind the gate, yes.

(M. Fana Dep. (Dkt. No. 81-4 at 49-50) Plaintiff was not shown the video at his deposition. (See id. at 50 ("Q. [] [M]y question is pretty simple. Immediately after being told to go behind the fence, you did not go behind the fence; is that correct? A. I would have to see the video. . . . [I]f I see the video I would be able to tell you or you could see the video for yourself, sir."))

The parties agree that Plaintiff ultimately moved behind the fence. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 81) ¶ 22; Olan Dep. (Dkt. No. 81-3) at 62-63 ("Q. Do you recall him stepping behind the fence? A. Yeah, he did at one time.")) After Plaintiff moved behind the fence, Detective Olan said, "[t]hank you very much." (M. Fana Video (Dkt. No. 83-1) at 4:22 to 4:23) From the video, it appears that Officer Demkiw completed his search of the suspects' car at about the time that Plaintiff moved behind the fence. (Id. at 4:25 to 4:30) As Plaintiff moved behind the fence, Officer Demkiw closed the car doors and stepped away from the vehicle. (Id.)

Officer Demkiw testified that – while he was searching the suspects' car – he was "aware that there was something going on behind [him]," and could "hear Detective Olan talking to somebody." (Demkiw Dep. (Dkt. No. 81-8) at 33) Officer Demkiw was "paying attention to what was going on behind [him] verbally, but [] didn't come out of the vehicle to address it." (Id. at 32) Instead, he "continued to search the vehicle." (Id. at 33) Although Officer Demkiw did not stop his search until it was completed, he testified that the exchanges between Plaintiff and Detective Olan distracted him, because he "was paying attention to Olan." (Id.) Sergeant Lynch similarly testified that Plaintiff was "deflecting [the officers'] attention from the situation [they] were involved i[n]." (Lynch Dep. (Dkt. No. 81-6) at 18)

Once Plaintiff was behind the fence, he continued to address the officers, saying that the police were "pulling us over for no reason, violating our rights 'cause we're [] Blacks, we're Hispanics. You guys are racists." (M. Fana Video (Dkt. No. 83-1) at 4:24 to 4:32) When Detective Olan responded, "I'm Hispanic," Plaintiff said, "[y]eah, you're racist also." (Id. at 4:33 to 4:36) About ten seconds later, Plaintiff complained that the officers were "pulling these guys over for no reason, locking them up, what's the purpose? Why you locking them up for?"

10

(Id. at 4:46 to 4:51) As the suspects were led away, Plaintiff shouted, "[y]o fam, you got a number that you want me to send this video to?" (Id. at 4:53 to 4:57)

As Plaintiff completed that question, Detective Olan began walking towards Plaintiff, with handcuffs in his right hand. (Id. at 4:57 to 5:00) Although Sergeant Lynch is not visible in the video, he also approached Plaintiff at this time, and can be heard telling Plaintiff, "it doesn't concern you." (See id. at 5:00 to 5:05; Lynch Dep. (Dkt. No. 81-6) at 21-22 ("I walked up there, I said something [to] the effect that this incident didn't concern him.")) Plaintiff's phone was then knocked downward, and the video ends five seconds later. (M. Fana Video (Dkt. No. 83-1) at 5:00 to 5:05) Sergeant Lynch testified that he placed Plaintiff under arrest "[i]mmediately" after approaching him. (Lynch Dep. (Dkt. No. 81-6) at 24) Detective Olan testified, however, that Plaintiff was not arrested when Sergeant Lynch first approached him. According to Detective Olan, Plaintiff was arrested "two, three minutes [later]," after he walked towards the officers and directed racial epithets at them. (Olan Dep. (Dkt. No. 81-3) at 72-74)

Plaintiff was charged with obstruction of governmental administration, in violation of New York Penal Law § 195.05, and disorderly conduct, in violation of New York Penal Law § 240.20(1). (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 81) ¶ 24) Sergeant Lynch testified that he made the decision to arrest Plaintiff and placed him in handcuffs. (Lynch Dep. (Dkt. No. 81-6) at 20, 24) Detective Olan assisted in the arrest, witnessed the relevant events, and informed Officer Demkiw of those events. (Olan Dep. (Dkt. No. 81-3) at 44-45, 50) Officer Demkiw swore out the criminal complaint against Plaintiff based on information supplied by Detective Olan. (Crim. Cmplt. (Dkt. No. 85-6); Demkiw Dep. (Dkt. No. 81-8) at 19-20 ("[T]he

11

way the complaint was written up was as per Detective Olan. . . . It was all informed by Detective Olan."))

All charges against Plaintiff stemming from his July 18, 2014 arrest were dismissed on December 8, 2014. (Def. Resp. to Pltf. R. 56.1 Stmt. (Dkt. No. 88) ¶ 30)

## DISCUSSION

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)). "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'" Yi Fu Chen v. Spring Tailor, LLC, No. 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks and citation

12

omitted)). However, a "'party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (alterations in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

"When the parties disagree as to the existence of a genuine dispute of a material fact, the Court may consult incontrovertible video evidence to determine whether summary judgment is nevertheless appropriate." Wiles v. City of New York, No. 13-CV-2898 (TPG), 2016 WL 6238609, at *3 (S.D.N.Y. Oct. 25, 2016) (citing Scott v. Harris, 550 U.S. 372, 379-80 (2007)). "[T]he mere existence of a videotape in the record depicting some or all of the events in dispute [is] not . . . dispositive," however. Hulett v. City of Syracuse, 253 F. Supp. 3d 462, 482 (N.D.N.Y. 2017). "[W]hile [] video evidence submitted by the parties [should] certainly be considered and carefully reviewed," summary judgment is appropriate only "where the video evidence in the record is sufficient to 'blatantly contradict[]' one party's versions of events." Id. (quoting Scott, 550 U.S. at 380).

"The same standard[s] appl[y] where, as here, the parties file[] cross-motions for summary judgment. . . ." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (internal citations omitted).

## II.   PROBABLE CAUSE TO ARREST

Probable cause to arrest is a complete defense to Plaintiff's claims for false arrest, malicious prosecution, failure to intercede, and First Amendment retaliation.  See Jenkins v. City of New York, 478 F.3d 76, 84 (2d Cir. 2007) ("The existence of probable cause to arrest . . . is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983.") (internal quotation marks and citations omitted); Drummond v. Castro, 522 F. Supp. 2d 667, 677 (S.D.N.Y. 2007) ("[T]he presence of probable cause is a complete defense to an action for malicious prosecution under § 1983 or state law."); Feinberg v. City of New York, No. 99 CV 12127 (RC), 2004 WL 1824373, at *4 (S.D.N.Y. Aug. 13, 2004) ("An officer who fails to intercede is liable for the preventable harm caused by the actions [] of the other officers where that officer observes or has reason to know . . . that a citizen has been unjustifiably arrested . . . . If the Court determines that the officer's conduct did not violate a constitutional right, however, the analysis ends. Thus, since [d]efendants had probable cause to arrest and charge the [p]laintiff, [d]efendants' motion for summary judgment on [the failure to intercede] claim is granted.") (internal quotation marks and citations omitted); Fabrikant v. French, 691 F.3d 193, 215 (2d Cir. 2012) ("The existence of probable cause . . . will [] defeat a First Amendment claim that is premised on the allegation that defendants prosecuted a plaintiff out a retaliatory motive, in an attempt to silence her.") (internal citation omitted).

"Probable cause exists when one has knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." Betts v. Shearman, 751 F.3d 78, 82 (2d Cir. 2014) (internal quotation marks and citation omitted).  In assessing probable cause, "[t]he inquiry is limited to whether the facts known by the

arresting officer at the time of the arrest objectively provided probable cause to arrest."
Gonzalez v. City of Schenectady, 728 F.3d 149, 155 (2d Cir. 2013) (internal quotation marks and citation omitted). Courts must also "look at the facts as the officers knew them in light of the specific elements of each crime." Id. "While an officer need not have concrete proof of each element of a crime to establish probable cause for an arrest, probable cause means more than bare suspicion." Id. (internal quotation marks and citations omitted).

Here, Plaintiff argues that Defendants did not have probable cause to arrest him for obstructing governmental administration, or for disorderly conduct. (Pltf. Br. (Dkt. No. 86) at 19-30) Defendants do not contend that there was probable cause to arrest Plaintiff for disorderly conduct, but they argue that that there was probable cause to arrest Plaintiff for obstructing governmental administration. (See Def. Br. (Dkt. No. 79) at 12-16; Def. Opp. (Dkt. No. 87) at 11 n.3 ("Defendants are defending [P]laintiff's motion for partial summary judgment based on the fact that there was probable cause for [P]laintiff's arrest arising from the charge of obstruction of governmental administration, not disorderly conduct."))

## A. The Elements of Obstructing Governmental Administration

Under New York Penal Law § 195.05,

[a] person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act. . . .

N.Y. Penal Law § 195.05. "An individual . . . may be convicted under this statute when (1) a public servant is performing an official function; (2) the individual prevents or attempts to prevent the performance of that function by interfering with it; and (3) the individual does so intentionally." Kass v. City of New York, 864 F.3d 200, 207 (2d Cir. 2017).

15

With respect to the first element, "an officer is deemed to be 'performing an official function' if that function is authorized by law." Gersbacher v. City of New York, No. 1:14-CV-7600 (GHW), 2017 WL 4402538, at *7 (S.D.N.Y. Oct. 2, 2017) (quoting Kass, 864 F.3d at 207).

As to the second element, "the interference must at least in part be 'physical' and cannot consist solely of verbal statements." Kass, 864 F.3d at 209 (quoting People v. Case, 42 N.Y.2d 98, 101-02 (1977)); see also Lee v. McCue, No. 04-CIV-6077 CM, 2007 WL 2230100, at *5 (S.D.N.Y. July 25, 2007) ("[W]ords alone, even abusive ones, cannot give rise to probable cause to arrest for obstructing governmental administration as a matter of law."). This does not mean that there must be "'physical force involved,'" however. Kass, 864 F.3d at 210 (quoting People v. Romeo, 9 A.D.3d 744, 745 (3d Dept. 2004)). Physical interference also includes "'inappropriate and disruptive conduct at the scene of the performance of an official function.'" Id. at 209-210 (quoting Romeo, 9 A.D. at 745). Accordingly, the second element "is satisfied when an individual 'intrude[s] himself into, or get[s] in the way of, an ongoing police activity.'" Id. at 210 (quoting In re Kendell R., 71 A.D.3d 553, 554 (1st Dept. 2010)); see also Hilderbrandt v. City of New York, No. 13-CV-1955 ARR VVP, 2014 WL 4536736, at *4 (E.D.N.Y. Sept. 11, 2014) ("The physical requirement . . . can be met [] by the physical encroachment on police officers' work or by the performance of threatening and distracting movements near officers.").

Under certain circumstances, a finding of interference "may [] be predicated on a defendant's refusal to obey orders to leave a premises, . . . to step back from an accident scene or to keep away from an area where a disturbance is taking place." Goodman v. City of New York, et. al., 14 CV 5261 (CM), 2015 U.S. Dist. LEXIS 37063, at *13 (S.D.N.Y. Feb. 18, 2015) (internal quotation marks and citations omitted). But "[f]ailing to obey a police order, in and of

itself, does not constitute a circumstance that gives rise to probable cause for an arrest for obstructing government administration." Dowling v. City of New York, No. 11-CV-4954 NGG RML, 2013 WL 5502867, at *4 (E.D.N.Y. Sept. 30, 2013). The failure to obey the order must "create[] some other hazard or interference [] [to] rise to the level of obstruction necessary for obstructing government administration." Id.

For example, this element may be met where an individual's refusal to obey orders evidences an "attempt[] to interfere with [] officers' efforts to [address] . . . a volatile situation," such as an altercation or medical emergency. Berger v. Schmitt, 91 F. App'x 189, 191 (2d Cir. 2004) (finding probable cause to arrest plaintiff for obstructing governmental administration where – after plaintiff "intervened in a verbal altercation between [an officer] and a supermarket patron" and was told to leave – plaintiff "started to depart, but [] doubled back in order to ask the various participants to the altercation for their names and contact information"; reasoning that "prudent officers could believe that [plaintiff] was attempting to interfere with the officers' efforts to contain what had only recently been a volatile situation"); Decker v. Campus, 981 F. Supp. 851, 858 (S.D.N.Y. 1997) (finding probable cause to arrest plaintiff for obstructing governmental administration where plaintiff, inter alia, "failed to comply with a deputy sheriff's instructions to 'step back' from the scene of an accident," and "approached a rescue worker, touched his arm, and asked him questions, while the worker was trying to save [the accident victim's] life"); Romeo, 9 A.D.3d at 744-45 (sufficient evidence to support conviction for obstructing governmental administration where officers were "attempting to subdue and transfer an arrested person from one police vehicle to another," and the "defendant kept approaching[,] despite several requests by one of the officers that he stay away and remain in a certain spot").

17

The interference element can also be met when an individual repeatedly disobeys "orders to move away from . . . a zone of danger," thereby "preventing [] officials from [performing an official function]." Wilder v. Village of Amityville, 288 F. Supp. 2d 341, 344-45 (E.D.N.Y. 2003) (finding probable cause to arrest plaintiff for "obstructing [] designated personnel from lawfully removing a tree," where plaintiff ignored three orders "to move from an area where she might be harmed [by] the tree's removal by being hit by a falling branch or limb"). This element is not satisfied, however, where the individual's "refusal to obey every command to back up" is merely "annoying and distracting." Charles v. City of New York, No. 12 CV 6180 SLT SMG, 2017 WL 530460, at *15 (E.D.N.Y. Feb. 8, 2017).

"To satisfy the third element, 'an individual must intend to prevent the public servant from performing the official function.'" Gersbacher, 2017 WL 4402538, at *7 (quoting Murray v. City of New York, No. 15-cv-6768-LGS, 2017 WL 3309728, at *4 (S.D.N.Y. Aug. 2, 2017)). In assessing this element, courts must "afford[] [officers] great latitude in ascertaining intent," because officers face "great 'practical restraints . . . in the field.'" Id. (quoting Kass, 864 F.3d at 210).

## B.   **Application**

Here, Plaintiff does not dispute that the defendant officers were performing an official function when Plaintiff approached them and filmed the arrest scene. Plaintiff argues, however, that "[t]here was not probable cause to believe that Plaintiff . . . physically obstructed an official government function." (Pltf. Opp. (Dkt. No. 80) at 30) Plaintiff further contends that

18

there are, "at the very least, triable issues of fact as to whether the officers reasonably believed [Plaintiff] possessed the specific intent to obstruct a police function." (Id. at 14)

Defendants respond that "Plaintiff's interference with the officers' work by 1) purposely moving to a position with an unabated path to [Officer] Demkiw's gun from his rear; and 2) not immediately complying with [Detective] Olan's eight orders to move behind the thigh high fence . . . is sufficient to establish probable cause for obstruction of governmental administration. . . ." (Def. Opp. (Dkt. No. 87) at 15) Defendants do not contend that Plaintiff performed any other "threatening [or] distracting movements," Hilderbrandt, 2014 WL 4536736, at *4, nor would the record support such an argument. (See Olan Dep. (Dkt. No. 81-3) at 38-39 ("Q. Did he ever threaten you or any of your fellow officers physically? A. No."); id. at 40 ("Q. So the best that you remember, he had the phone in front of him, holding it up, recording the entire time? A. Yes."))

### 1. The Interference Element

With respect to the interference element, Dowling v. City of New York, No. 11-CV-4954 NGG RML, 2013 WL 5502867 (E.D.N.Y. Sept. 30, 2013), is instructive. In Dowling, the plaintiff "exited [a] liquor store to find that . . . his brother was being searched" for allegedly "urinating on the sidewalk." Id. at *1. The plaintiff "approached [an officer] who was not taking part in the search, but standing approximately ten feet away from the search," and "asked why the police were searching his brother." Id. That officer immediately "yelled at [p]laintiff to back up," and "[p]laintiff stopped, approximately two to three feet from [the officer], and said he was not approaching." Id. The officer "told [plaintiff] to back up again," but "[p]laintiff stayed put and gave the same response." Id. The officer "then pushed [p]laintiff back and instructed

another officer to arrest him." Id. "During this time, [p]laintiff did not try to talk to his brother and remained about ten feet away from his brother." Id.

Plaintiff sued for false arrest, and the defendant officers moved for summary judgment on the ground that they had probable cause to arrest plaintiff for obstructing governmental administration. Id. at *3. The court denied the officers' motion, finding that there were "key questions of fact" regarding "whether [p]laintiff placed himself physically in between the police and the other person, and whether [p]laintiff remained calm or became disorderly enough to interfere with police action." Id. at *6.

Charles v. City of New York, No. 12 CV 6180 SLT SMG, 2017 WL 530460 (E.D.N.Y. Feb. 8, 2017), is also instructive. In Charles, plaintiff "observed an encounter between [two officers] and teenagers" whom she did not know. Id. at *1. "Standing about five feet from the officers, [plaintiff] asked why they had stopped the teens." Id. The plaintiff also started to videotape the officers, using her phone. Id. One of the officers told plaintiff that "it was 'police business,' and accus[ed] [p]laintiff of 'interfering' in it." Id. Plaintiff "stepped backwards on two occasions at the request of [an officer], but refused to comply with [a] third request [to step back]." Id. Plaintiff was then arrested and charged with disorderly conduct. Id. at *11.

The plaintiff sued for false arrest, and the defendant officers moved for summary judgment on the ground that they had probable cause to arrest the plaintiff for obstructing governmental administration.[5] Id. at *11, 13. The court denied the motion, finding that "there [wa]s a genuine issue of material fact with respect to whether [p]laintiff physically interfered

---

[5] "[A] claim for false arrest turns only on whether probable cause existed to arrest a defendant, and [] it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." Jaegly v. Couch, 439 F.3d 149, 154 (2d Cir. 2006).

with the officers' performance of an official function." Id. at *15. The court explained that, although "[p]laintiff may have delayed the process of questioning the teens, [] there is evidence that the officers were nonetheless able to do so." Id. The court also noted that "[t]here [wa]s no evidence that [p]laintiff physically interfered with the officers' questioning of the teens, even though her alleged refusal to obey every command to back up and her insistence on videotaping 'aggressively' and 'directly in [the officer's] face' may have proved annoying and distracting." Id. (internal citations omitted).

Here, there is no evidence that Plaintiff physically interfered with any officer's activity at the arrest scene, including Officer Demkiw.[6] Charles, 2017 WL 530460, at *15. To the contrary, Plaintiff never had any physical contact with Officer Demkiw or any other officer, and never attempted to physically obstruct Officer Demkiw's search of the car. (See M. Fana Video (Dkt. No. 83-1) at 3:00 to 5:00; Demkiw Dep. (Dkt. No. 81-8) at 20 ("If you're asking did he personally prevent me, get in the car or push me away from the car, no he didn't step in between myself and the car.")) Plaintiff's presence and actions likewise did not materially delay or hinder Officer Demkiw's search of the car, which Officer Demkiw successfully completed.

---

[6] For this reason, Defendants' reliance on Kass v. City of New York, 864 F.3d 200 (2d Cir. 2017), is misplaced. (See July 25, 2017 Def. Ltr. (Dkt. No. 96)) In Kass, protesters had gathered in a park, and officers had "placed barricades around the perimeter of the park" to "ensure crowd control and security." Id. at 204, 207. Plaintiff noticed the protest, and approached the confined area. From a position outside the barricades, he "engaged in a non-confrontational conversation with several protestors." Id. at 204. "After [plaintiff] had spoken with the protestors for a minute or two," officers "instructed [plaintiff] several times to continue walking," id., but plaintiff "refused to obey the officers' repeated orders to move along. . . ." Id. at 210. When an officer "placed his hand on [plaintiff]'s elbow to guide [plaintiff] away from the barricades, [plaintiff] instructed [the officer] to 'get [his] hands off' of him and pulled away." Id. The Second Circuit held that, under these circumstances, "[a] reasonable officer could conclude . . . that [the plaintiff] had physically 'gotten] in the way of' and frustrated the officers' efforts to contain the protest and prevent sidewalk congestion." Id. Here, however, Plaintiff did not physically get "in the way of" Officer Demkiw's search of the suspects' car, or otherwise physically interfere with any other officer at the arrest scene.

(See M. Fana Video (Dkt. No. 83-1) at 4:25 to 4:30; Demkiw Dep. (Dkt. No. 81-8) at 32-33 ("Q. At any point, were you hindered in searching the vehicle? A. I was paying attention to what was going on behind me verbally, but I didn't come out to address it, no. Q. So, you were able to continue searching the vehicle? A. I continued searching the vehicle, I was aware that there was something going on behind me, I could hear Detective Olan talking to somebody. Q. Again, the question is, did this interaction between Detective Olan and [Plaintiff] hinder you at all in searching the vehicle? A. I continued to search the vehicle."))

Acknowledging Office Demkiw's testimony that he was aware of the dialogue between Plaintiff and Detective Olan, it would be a fair inference that Plaintiff might have posed a mild distraction to Officer Demkiw as he performed the search. (See also Demkiw Dep. (Dkt. No. 81-8) at 33 ("Q. Did this interaction distract you while you were searching the vehicle[?] A. It had potential to, yes. Q. Did it? A. I was paying attention to Olan, so, yes, it did.")) But even assuming arguendo that Plaintiff's behavior presented some measure of annoyance and distraction to Office Demkiw, the distraction and annoyance to Officer Demkiw did not rise to the level of obstructing governmental administration.

With respect to the alleged safety issue caused by Plaintiff's proximity to Officer Demkiw and his firearm, there are material issues of fact. Because Officer Demkiw's back was turned to Plaintiff and he was fully engaged in the search of the suspects' car, he was vulnerable to an attack from the rear, and his weapon was exposed. The video does not clearly show how close Plaintiff was to Officer Demkiw, however, nor – for a period of about thirty seconds – does it depict the location of the other officers. (See M. Fana Video (Dkt. No. 83-1) at 3:12 to 3:34) There is also conflicting testimony about how close Plaintiff was to Officer Demkiw. Detective Olan testified that Plaintiff was about ten to fifteen feet away from Officer Demkiw (Olan Dep.

22

(Dkt. No. 81-3) at 59), but that Detective Olan was always closer to Officer Demkiw than Plaintiff was. (Id. at 34-35) Sergeant Lynch testified, however, that he observed Plaintiff get "within five feet" of an officer. (Lynch Dep. (Dkt. No. 81-6) at 18) Although Sergeant Lynch was unable to specify which officer (id. at 19) – given the circumstances -- a jury could infer that it was Officer Demkiw.

There is also a material issue of fact as to whether Plaintiff moved closer to Officer Demkiw after Detective Olan asked Plaintiff to step back. Detective Olan testified that every time he instructed Plaintiff to move behind the fence, he stepped back. (See Olan Dep. (Dkt. No. 81-3) at 60 ("When I told him to step back, he was slowly stepping back. . . . He didn't stay still, no.")) Sergeant Lynch testified, however, that when Plaintiff was instructed to go behind the fence, he sometimes moved closer to the suspects' vehicle. (Lynch Dep. (Dkt. No. 81-6) at 18 ("Q. Just so I understand, you noticed [Plaintiff], you heard Detective Olan tell him to back up. [Plaintiff] then got closer to the vehicle, is that correct? Yes."); id. at 26 ("At one point, after being asked to move six times, he got closer to the vehicle."))

Goodman v. City of New York, 14 CV 5261 (CM), 2015 U.S. Dist. LEXIS 37063 (S.D.N.Y. Feb. 18, 2015), which Defendants claim is "directly on point" (Def. Br. (Dkt. No. 87) at 19), does not alter the Court's conclusion that there are material issues of fact. In Goodman, "EMT personnel were helping a woman who was confined to a motorized wheelchair . . . [that] had ceased operating because of a battery problem," and "[t]hree police officers . . . were present at the scene, about 20 feet away from where the EMTs were attending the woman." Goodman, 2015 U.S. Dist. LEXIS 37063 at *2-3. When the plaintiff "encountered this activity," she "decided that she should record th[e] [] 'interaction' – [] because she overheard one of the EMTs telling the woman, 'You can't just call 911 when you run out of juice.'" Id. at *3.

Plaintiff proceeded to "walk[] about 10 feet beyond where the officers were standing . . . and held up her smartphone to try to record whatever might happen." Id. One of the police officers then approached plaintiff, and began recording "a portion of his interaction with plaintiff – in his words, to 'cover myself [because] I don't know what you're about.'" Id. The plaintiff and the officer then began "arguing . . . about whether [the officer] could videotape her." Plaintiff became agitated, "which caused [the officer] to ask her . . . to calm down." Id. at *14. In the midst of this "altercation," one of the EMTs approached plaintiff and asked her to "'go over there' and 'move out of the way, we have a patient.'" Id. Plaintiff refused to move, id., and said, "Are you fucking kidding me?" Id. at *4. "Immediately after she said that, she was arrested." Id.

Plaintiff sued for false arrest, but the court held that "there was, at a minimum, 'arguable probable cause' to arrest and prosecute plaintiff on a charge of obstruction of governmental administration." Id. at *13. The court reasoned that "the altercation was obviously interfering with the EMTs, because one of them approached and asked plaintiff to [back away]," and the court emphasized that "[i]t was only . . . after plaintiff refused the EMT technician's direction that she move away . . . that [the officer] arrested her." Id. at *14.

Here, there is evidence that Plaintiff stepped back when Detective Olan asked him to go behind the fence, and it is undisputed that Plaintiff ultimately complied with Detective Olan's request to go behind the fence. Indeed, when Plaintiff was arrested, he was behind the fence. (Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 81) ¶¶ 21-22, 24) Accordingly, Goodman is distinguishable.

Husbands v. City of New York, No. 05 CIV 9252 NRB, 2007 WL 2454106 (S.D.N.Y. Aug. 16, 2007), also cited by Defendants (Def. Reply (Dkt. No. 82) at 8), is likewise

24

distinguishable. In Husbands, the incident at issue "commenced when four or five gunshots suddenly rang out . . . in the direction some officers were standing." Husbands, 2007 WL 2454106, at *1. After one of the officers identified an individual whom he suspected was the shooter, "[s]everal officers . . . followed [the suspect] and ordered him to stop at least three times." Id. at *2. The suspect "did not stop," however, and entered an apartment building. Id. Officers then pursued the suspect into the building and apprehended him in the lobby. Id. at *2, 5.

While effectuating the suspect's arrest, officers pushed the suspect to the ground, "repeatedly asked . . . 'Where is the gun?' and repeatedly ordered [the suspect] to 'stop moving' and 'stay still.'" Id. at *2. The suspect's sister, "who had followed [the suspect] into the building, echoed the police commands . . . , beseeching him to comply." Id. The suspect "kept his hands at his sides so as to avoid being handcuffed," however, so the arresting officer "thought that [the suspect] might be reaching for a gun." Id. The suspect's sister, "aware that the police might think this to be the case, again urged her brother to comply." Id. She also "stepped closer to her brother during the course of his arrest." Id. One of the officers who was "kneeling alongside" the suspect "then told her to 'get back,' pushed her backwards away from [the suspect], and instructed her twice to get on the ground." Id. That officer then arrested the suspect's sister for obstructing governmental administration and disorderly conduct. Id.

The suspect's sister sued for false arrest, but the court held that there was probable cause to arrest her for obstructing governmental administration. Id. at *13. The court reasoned that "there was a concern that [the suspect] was attempting to reach for a gun"; that "the officers needed to be entirely focused on the effectuation of [the suspect]'s arrest"; and that "any

disturbance of the officers – by attempting to speak to [the suspect], and by taking a step toward the officers – may be viewed as sufficient interference." Id.

Here, by the time Plaintiff took up a position across from Officer Demkiw, the three suspects had been handcuffed without incident. (See Pltf. Resp. to Def. R. 56.1 Stmt. (Dkt. No. 81) ¶ 11; M. Fana Video (Dkt. No. 83-1) at 2:40 to 2:53) Accordingly, a "prudent officer[]" would not have concluded that Plaintiff – by re-positioning himself to film Officer Demkiw's search of the suspects' car – "was attempting to interfere with officers' efforts to contain what had only recently been a volatile situation." Berger, 91 F. App'x at 191.

Defendants' reliance on Basinski v. City of New York, 706 F. App'x 693 (2d Cir. 2017), is similarly misplaced. (See Aug. 25, 2017 Def. Ltr. (Dkt. No. 99)) In Basinski, plaintiff was "standing next to [a] food cart" located outside an NYPD precinct when an officer emerged from the precinct and told the vendor "'not to sell' in this location." Basinski, 706 F. App'x at 695. As the officer approached the food cart, plaintiff began to film the encounter on his cell phone. Id. The officer then asked plaintiff "to move away from the cart." Id. Plaintiff responded "that he was not in [the officer]'s way," and the officer asked him to move again. Id. After the plaintiff "moved a few paces away from the cart," the officer "continued to ask [plaintiff] to move [away]." Id. Plaintiff not only refused to move further away, but also "stepp[ed] slightly forward toward [the officer]." Basinski, 706 F. App'x at 695, 699; see also Basinski, 192 F. Supp. 3d 360, 363 (S.D.N.Y. 2016) ("[W]hen [the officer] attempted to turn his focus from [plaintiff] back to his original police business, [the plaintiff] took a step towards [the officer], rather than remaining off to the side as instructed."). From that position, plaintiff was "within striking distance of the officer." Basinski, 192 F. Supp. 3d at 363.

Here, there are fact issues regarding Plaintiff's proximity to Officer Demkiw, and whether Plaintiff moved toward Officer Demkiw after he was repeatedly asked to step back. Accordingly, Basinski is distinguishable.

Because there are material issues of facts as to the interference element of an obstructing governmental administration charge, neither side is entitled to summary judgment on this issue.

### 2.   The Intent Element

With respect to the intent element of an obstructing governmental administration charge, the defendant officers had to have probable cause to believe that Plaintiff was not merely trying to film the officers, or voicing his concerns about police misconduct, but that he intended to interfere in the officers' investigation and arrest of the suspects. See Dowling, 2013 WL 5502867, at *4 ("In this case, Officer Gasquez would have had to have probable cause to believe that [p]laintiff was not merely trying to question officers about why they were searching his brother, or expressing his annoyance, but that his intent was to interfere in the search, and ultimately the arrest, of [his brother].").

The video shows that Plaintiff stated repeatedly that he was "not threatening anyone" and was "just [t]here recording." (M. Fana Video (Dkt. No. 83-1) at 3:34 to 3:39; see also id. at 2:15 to 2:20 ("That's it.  I'm just recording.  No problem with that.")) The video also shows that Plaintiff never made, attempted to make, or threatened to make physical contact with Officer Demkiw.  Instead, during the entire episode, Plaintiff stood with his phone held out in front of his body recording the arrest scene.  (Id. at 3:00 to 5:00)

There is evidence, however, that Plaintiff repeatedly accused the officers of racism, and of unfairly arresting African-Americans and Hispanics.  Plaintiff also repeatedly

27

questioned why the three suspects were being arrested. Given the evidence that Plaintiff moved towards Officer Demkiw after he had been repeatedly instructed to step back, there are material issues of fact as to whether Plaintiff had the intent to interfere with the investigation and arrest of the three suspects. This Court also acknowledges that it must "afford[] [officers] great latitude in ascertaining intent." Gersbacher, 2017 WL 4402538, at *7.

Because there are material issues of fact as to whether Defendants had probable cause to believe that Plaintiff intended to interfere with the investigation and arrest of the three suspects, neither side is entitled to summary judgment on this issue.

## III.    QUALIFIED IMMUNITY

"[E]ven in the absence of probable cause, a police officer is entitled to qualified immunity if . . . there was 'arguable' probable cause to arrest." Hays v. City of New York, No. 14-CV-10126 JMF, 2017 WL 782496, at *3 (S.D.N.Y. Feb. 28, 2017) (citing Jenkins, 478 F.3d at 87). Arguable probable cause to arrest exists if either "(a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Dancy v. McGinley, 843 F.3d 93, 107 (2d Cir. 2016) (internal quotation marks and citations omitted). "'Arguable probable cause should not be misunderstood to be mean almost probable cause.'" Id. (quoting Jenkins, 478 F.3d at 87). "'If officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause, the fact that it came close does not immunize the officer.'" Id. (quoting Jenkins, 478 F.3d at 87).

Defendants contend that they had arguable probable cause to arrest Plaintiff based on his proximity to Officer Demkiw and his firearm, and Plaintiff's response to Detective Olan's orders to step back. (See Def. Br. (Dkt. No. 79) at 19-20 ("[P]laintiff at least 'arguably'

28

interfered with the officers' investigation [because] of how close he approached [Officer] Demkiw's gun unabated, and [because Plaintiff did not] immediately comply[] with approximately eight orders of Det. Olan to [videotape from] behind [the] thigh high fence.")) As discussed above, however, there are material issues of fact regarding Plaintiff's proximity to Officer Demkiw and his response to Detective Olan's orders to step back. These issues of fact preclude a determination as a matter of law as to whether Defendants possessed arguable probable cause to arrest Plaintiff.

Indeed, if the jury credits Detective Olan's testimony that Plaintiff was at least ten feet away from Officer Demkiw at all times (Olan Dep. (Dkt. No. 81-3) at 33); that Detective Olan was always closer to Officer Demkiw than Plaintiff was (id. at 34-35); and that Plaintiff stepped back when Detective Olan asked him to move behind the fence (id. at 32, 60), then it could reasonably conclude that "officers of reasonable competence would have to agree that the information possessed by the officer[s] at the time of arrest did not add up to probable cause."[7] Dancy, 843 F.3d at 107.

---

[7] Officer Demkiw's testimony supports this conclusion:

Q. . . . [I]t says here in [the criminal complaint] that [Plaintiff] refused to comply with Detective Olan's requests that he back up, correct?

A. Correct.

Q. And there's no indication in this document that [Plaintiff] ever did actually comply with those requests; is that correct?

A. According to the criminal complaint, it doesn't say he complied, he wouldn't have been under arrest if he complied.

Q. Did Detective Olan ever mention to you that [Plaintiff] did comply with the requests that he back up?

A. No.

Accordingly, the Court cannot conclude, as a matter of law, that Defendants'
actions are protected by qualified immunity. Oliveira v. Mayer, 23 F.3d 642, 649 (2d Cir. 1994)
("Though immunity ordinarily should be decided by the court, . . . that is true only in those cases
where the facts concerning the availability of the defense are undisputed; otherwise, jury
consideration is normally required.") (internal quotation marks and citation omitted)

## IV.     FIRST AMENDMENT RETALIATION

### A.     Elements

"To prevail on a claim for First Amendment retaliation, a private citizen must
prove that: '(1) he has an interest protected by the First Amendment; (2) [the] defendants'
actions were motivated or substantially caused by his exercise of that right; and (3) [the]
defendants' actions effectively chilled the exercise of his First Amendment right.'" Gersbacher,
2017 WL 4402538, at *14 (quoting Kuck v. Danaher III, 600 F.3d 159, 168 (2d Cir. 2010)).

### B.     Clearly Established First Amendment Right

Defendants argue that they are entitled to qualified immunity on Plaintiff's First
Amendment retaliation claim, because it was not "clearly established" that Plaintiff was engaged
in an activity protected by the First Amendment. (Def. Br. (Dkt. No. 79) at 20) It is well settled
that "[a] state actor charged under § 1983 with violating a plaintiff's constitutional rights is
entitled to have the action dismissed on the basis of qualified immunity if[,] at the time of the
challenged conduct[,] there was no 'clearly established law' that such conduct constituted a
constitutional violation." Lynch v. Ackley, 811 F.3d 569, 578 (2d Cir. 2016) (quoting Harlow v.
Fitzgerald, 457 U.S. 800, 818 (1982)). According to Defendants, "the defendant officers could
not have violated a 'clearly established' right of [P]laintiff," because "neither the United States

---

(Demkiw Dep. (Dkt. No. 81-8) at 16-17 (emphasis added))

Supreme Court nor the Second Circuit . . . . had ruled that [P]laintiff had a First Amendment right to film as of [his July 2014 arrest]." (Def. Br. (Dkt. No. 79) at 20)

Plaintiff does not contend that he was exercising a clearly established right to film, however. (See Pltf. Opp. (Dkt. No. 80) at 30) Instead, Plaintiff argues that he "was engaged in activity protected by the First Amendment when he voiced his concerns about police misconduct" (id. at 25), and that – if the defendant officers arrested Plaintiff "in retaliation for his words" – there is "no reasonable argument that they are entitled to qualified immunity." (Id. at 30) "Plaintiff has a well-settled right to complain about police misconduct . . . without being subjected to retaliation." Torres v. Vill. of Sleepy Hollow, 379 F. Supp. 2d 478, 485 (S.D.N.Y. 2005) (citing Kerman v. City of New York, 261 F.3d 229, 241-42 (2d Cir. 2001)).

In sum, Plaintiff's First Amendment retaliation claim is premised on a well settled right. Accordingly, the defendant officers are not entitled to qualified immunity on this basis.

## C.     **Retaliatory Intent**

Defendants also contend that Plaintiff's First Amendment retaliation claim fails because Plaintiff "can offer no specific proof of an improper motive on the part of any of the defendant officers." (Def. Br. (Dkt. No. 79) at 16) "'Specific proof of improper motivation is required in order for plaintiff to survive summary judgment on a First Amendment retaliation claim.'" Vaher v. Town of Orangetown, N.Y., 133 F. Supp. 3d 574, 596 (S.D.N.Y. 2015) (quoting Curley v. Vill. of Suffern, 268 F.3d 65, 73 (2d Cir. 2001)). "Direct evidence of retaliatory intent is not required," however, and "'circumstantial evidence may be . . . sufficient to raise a genuine issue of material fact precluding the grant of summary judgment.'" Id. (quoting Barrington v. New York, 806 F.Supp.2d 730, 747 (S.D.N.Y. 2011)).

31

Here, the video of the incident demonstrates that Detective Olan walked toward Plaintiff with handcuffs in his right hand less than ten seconds after Plaintiff accused the officers of "pulling these guys over for no reason, locking them up," and asking the officers, "what's the purpose? Why you locking them up for?" (M. Fana Video (Dkt. No. 83-1) at 4:46 to 5:00) Moreover, Sergeant Lynch testified that he approached Plaintiff at the same time as Detective Olan, and that he arrested Plaintiff immediately. (Lynch Dep. (Dkt. No. 81-6) at 21-22, 24) A jury could reasonably infer from evidence in the record that the defendant officers arrested and brought charges against Plaintiff in retaliation for his protected speech. Accordingly, Defendants are not entitled to summary judgment on Plaintiff's First Amendment retaliation claim.

## CONCLUSION

For the reasons stated above, the parties' cross-motions for summary judgment are denied. The Clerk of Court is directed to terminate the motions. (Dkt. Nos. 77, 84)

This case will proceed to trial on **Monday, June 4, 2018, at 9:30 a.m.** The parties are directed to comply with this Court's Individual Rules concerning the preparation of a pre-trial order. The joint pre-trial order, motions in limine, proposed voir dire, and requests to charge are due on May 6, 2017. Responsive papers, if any, are due on May 16, 2017.

Dated: New York, New York
       March 27, 2018

                                        SO ORDERED.

                                        Paul G. Gardephe
                                        Paul G. Gardephe
                                        United States District Judge